Slip Op. 20-65

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., | |
| Plaintiffs, | |
| and | |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, ET AL., | |
| Consolidated Plaintiffs, | Before: Mark A. Barnett, Judge Consol. Court No. 18-00232 |
| v. | **Public Version** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final results in the tenth administrative review of the antidumping duty order on activated carbon from the People's Republic of China.]

Dated: May 13, 2020

<u>David A. Hartquist</u>, <u>R. Alan Luberda</u>, <u>John M. Herrmann</u>, and <u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, for Plaintiffs/Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.

<u>Antonia R. Soares</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Ayat Mujais</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Francis J. Sailer</u>, <u>Dharmendra N. Choudhary</u>, and <u>Jordan C. Khan</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Consolidated Plaintiffs/ Defendant-Intervenors Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the tenth administrative review ("AR10") of the antidumping duty order on certain activated carbon from the People's Republic of China ("the PRC" or "China") for the period of review April 1, 2016 through March 31, 2017 ("the POR").  *See Certain Activated Carbon From the People's Republic of China*, 83 Fed. Reg. 53,214 (Dep't Commerce Oct. 22, 2018) (final results of antidumping duty admin. review; 2016–2017) ("*Final Results*"), ECF No. 29-4, and accompanying Issues and Decision Mem., A-570-904 (Oct. 16, 2018) ("I&D Mem."), ECF No. 29-5, as amended by *Certain Activated Carbon From the People's Republic of China*, 83 Fed. Reg. 58,229 (Dep't Commerce Nov. 19, 2018) ("*Amended Final Results*") (am. final results of antidumping duty admin. review; 2016–2017).[1]

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 29-1, and a Confidential Administrative Record ("CR"), ECF No. 29-2.  Parties submitted public and confidential joint appendices containing record documents cited in their briefs.  *See* Non-Confidential J.A., ECF Nos. 55-1 (Vol. I), 55-2 (Vol. II), 55-3 (Vol. III); Confidential J.A. ("CJA"), ECF Nos. 54-1 (Vol. I), 54-2 (Vol. II), 54-3 (Vol. III).  The court references the confidential

Plaintiffs Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") challenge Commerce's selection of partial adverse facts available ("partial AFA") and surrogate values for certain of Carbon Activated Tianjin Co. Ltd.'s ("Carbon Activated") factors of production ("FOP"), specifically, coal tar and financial ratios.  *See* Pls.' Mot. for J. on the Agency R., ECF No. 33 and Confidential Pls.' Rule 56.2 Mem. of Law ("Calgon's Mem."), ECF No. 34.  Consolidated Plaintiffs Carbon Activated Corporation ("CAC"), Carbon Activated, Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("Cherishmet") (collectively, "Carbon Activated Group")[2] challenge Commerce's selection of surrogate values for carbonized material and hydrochloric acid; the agency's refusal to apply Carbon Activated Group's methodology to cap the coal tar surrogate value; and the agency's adjustments to the surrogate financial ratios.  *See* Confidential Pls.' Mot. For J. on the Agency R. Pursuant to Rule 56.2 and Confidential Mem. of Law in Supp. of Pls.'

---

version of the relevant record documents throughout this opinion, unless otherwise specified.

[2] The court refers to Consolidated Plaintiffs as "Carbon Activated Group."  The court refers to those Consolidated Plaintiffs that participated in the underlying administrative proceedings—CAC, Carbon Activated, and DJAC—together, as "Respondents."  *See* Selection of Respondents for Individual Review (June 26, 2017) at 1, CR 3, PR 30, CJA (Vol. I) Tab 7; Case Br. of [DJAC], [Carbon Activated] and [CAC] (June 18, 2018) ("Respondents' Case Br.") at 1, CR 199, PR 226, CJA (Vol. III) Tab 30.

On February 5, 2019, the court consolidated the member cases in which Calgon had intervened under this lead case.  *See* Docket Order (Feb. 5, 2019) ECF No. 28; *Carbon Activated Tianjin Co., Ltd., et al. v. United States, et al.*, Court No. 18-00243; *Datong Juqiang Activated Carbon Co., Ltd., et al. v. United States, et al.*, Court No. 18-00245.

Mot. For J. on the Agency R. Pursuant to USCIT Rule 56.2 ("Carbon Activated Group's Mem."), ECF No. 35.

Defendant United States ("the Government") filed a response supporting Commerce's determination and arguing that Carbon Activated Group failed to exhaust administrative remedies with respect to its financial-ratios argument.  *See* Confidential Corrected Def.'s Resp. to Pls.' and Consol. Pls.'/Def.-Ints.' Rule 56.2 Mot[s]. For J. Upon the Agency R. ("Gov't's Resp."), ECF No. 59.  Calgon and Carbon Activated Group each filed a response as Defendant-Intervenors, *see* Confidential Def.-Ints.' Carbon Activated, DJAC and Cherishmet's Resp. to [Pls.'] Rule 56.2 Mot[]. for J. Upon the Agency R. ("Carbon Activated Group's Resp."), ECF No. 46; Resp. Br. of Calgon Carbon Corp. and Cabot Norit Americas, Inc. ("Calgon's Resp."), ECF No. 48, and a reply in support of their respective motions, *see* Pls.' Reply Br. ("Calgon's Reply"), ECF No. 49; Confidential Consol. Pls.' Reply to Def. and Def.-Ints.' Resp. to Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Carbon Activated Group's Reply"), ECF No. 50.

For the following reasons, the court remands Commerce's choice of surrogate value for carbonized material and the agency's adjustments to the surrogate financial ratios.  The *Final Results*, as amended by the *Amended Final Results*, are otherwise sustained.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)(2012),[3] and 28 U.S.C.

§ 1581(c)(2012).  The court will uphold an agency determination that is supported by

substantial evidence and otherwise in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B)(i).

DISCUSSION

I.    **Commerce's Selection of Partial AFA**

    **A. Legal Framework**

When "necessary information is not available on the record," or an interested

party "withholds information" requested by Commerce," "fails to provide" requested

information by the submission deadlines, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available."  *Id.* § 1677e(a).  Commerce's

authority to use the facts otherwise available is subject to 19 U.S.C. § 1677m(d).  *Id*.

Pursuant to § 1677m(d), if Commerce determines that a respondent has not complied

---

[3] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition.  However, the Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015), made several amendments to the antidumping and countervailing duty laws. Section 502 of the TPEA amended 19 U.S.C. § 1677e.  *See* TPEA § 502.  The TPEA amendments affect all antidumping duty determinations made on or after August 6, 2015.  *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793 (Dep't Commerce Aug 6, 2015) ("*TPEA Effective Date*").  Accordingly, all references to 19 U.S.C. § 1677e are to the amended version of the statute.

with a request for information, it must promptly inform that respondent of the nature of

the deficiency and, to the extent practicable in light of statutory deadlines, provide "an

opportunity to remedy or explain the deficiency."  *Id*. § 1677m(d).

    If Commerce determines that the party "has failed to cooperate by not acting to

the best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  *Id*. § 1677e(b).  As AFA, Commerce may rely on any of the

following sources of information: "(A) the petition, (B) a final determination in the

investigation under this subtitle, (C) any previous review under section 1675 of this title

or determination under section 1675b of this title, or (D) any other information placed on

the record."  *Id.* § 1677e(b)(2).

    The statute "gives Commerce substantial discretion to decide which record

information to use."  *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1346 (Fed*.

Cir. 2016).  "[T]he purpose of the adverse facts statute is 'to provide respondents with

an incentive to cooperate' with Commerce's investigation."  *Maverick Tube Corp. v.

United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting *Essar Steel Ltd. v. United

States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012)).  Nevertheless, AFA is not intended to

result in "punitive, aberrational, or uncorroborated margins."  *F.lli De Cecco Di Filippo

Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  The

statute does not obligate "Commerce to select facts that reflect a certain amount of

sales, yield a particular margin, fall within a continuum according to the application of

particular statistical methods, or align with standards articulated in other statutes and regulations*."* *Nan Ya*, 810 F.3d at 1347.

### B.  Background

One of Carbon Activated's suppliers ("Supplier X")[4] purchased activated carbon from another company and sold it to Carbon Activated as subject merchandise after performing certain processing to the merchandise.  I&D Mem. at 5–6.  Rather than report the factors of production for the producer that sold to Supplier X as instructed by Commerce, Carbon Activated instead reported Supplier X's purchases of activated carbon as its own input material to be assigned a surrogate value.  *Id.* at 5.  Commerce did not consider Supplier X to be the producer of the activated carbon in question and found that Carbon Activated failed to provide the appropriate factors of production as requested.  Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Review (May 3, 2018) ("Prelim. Decision Mem.") at 17–18, PR 214, CJA (Vol. I) Tab 2.  Therefore, Commerce used AFA to determine the normal value "for the sales corresponding to the FOP data for which [S]upplier X reported subject merchandise as an input."  *Id.* at 17.

For the *Preliminary Results*, *see generally Certain Activated Carbon From the People's Republic of China*, 83 Fed. Reg. 23,254 (Dep't Commerce May 18, 2018)

---

[4] The supplier in question was [[                                                      ]] and is referred to throughout as Supplier X.  Final Results Margin Calculation for Carbon Activated (Oct. 16, 2018) ("Final AFA Calculation Mem.") at 2, CR 211–17, PR 251, CJA (Vol. III) Tab 36.

("*Prelim. Results*") (prelim. results of antidumping duty admin. review and prelim.

determination of no shipments; 2016–2017), PR 213, CJA (Vol I) Tab 1, Commerce

selected Carbon Activated's highest calculated normal value for any CONNUM[5] as AFA,

Prelim. Decision Mem. at 18.  For the *Final Results*, Commerce agreed with some of the

concerns raised by Calgon and indicated that, as AFA, it would select the highest

calculated normal value for any respondent in AR10.  I&D Mem. at 6.  Commerce

indicated that this change would resolve concerns based on Carbon Activated's

perceived ability to manipulate the selection of AFA.[6]  *Id.*

### C.  Parties' Contentions

Calgon argues that Commerce's AFA selection fails to satisfy the statutory intent

to ensure that a party does not obtain a more favorable result by failing to cooperate

than if it had cooperated fully.  Calgon's Mem. at 25–28.  Calgon further complains that,

as a result of Commerce's selection of two mandatory respondents, Commerce's AFA

methodology would allow a respondent to manipulate the record to its benefit.  *Id.* at 27.

As an alternative, Calgon contends that Commerce should use the intermediate input

methodology to value Supplier X's activated carbon purchases.  *Id.* at 28–30.

---

[5] CONNUM refers to "control number," which is a number designed to reflect the "hierarchy of certain characteristics used to sort subject merchandise into groups" and allow Commerce to match identical and similar products across markets.  *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018).
[6] Despite modifying the methodology, [[

]].  Final AFA Calculation Mem.

at 2.

The Government[7] responds that Commerce's AFA selection is supported by substantial evidence because: (1) the agency has substantial discretion in selecting AFA, Gov't's Resp. at 16 (citing *Nan Ya*, 810 F.3d at 1346); (2) Commerce's AFA selection was an appropriate use of its discretion, *id.* at 16–17; and (3) Calgon's concerns that Carbon Activated manipulated (or could have manipulated) the AFA selection are unfounded and speculative, *id*. at 17–19.  Because Commerce's selection of AFA is supported by substantial evidence, the Government argues, the agency was not obligated to apply the intermediate input methodology.  *Id*. at 19.

### D.  Substantial Evidence Supports Commerce's Selection of Partial AFA

Here, Commerce considered three options to fill the gap in the record as partial AFA: "1) the highest calculated [normal value] for any of Carbon Activated's suppliers; 2) Thai Global Trade Atlas (["]GTA["]) import data to calculate a [surrogate value] for activated carbon; or 3) the highest [normal value] calculated for any respondent and its suppliers."  I&D Mem. at 6.  Commerce explained that the first option presented the potential that a respondent could manipulate their reporting to reduce their antidumping margin.  *Id*.  Commerce declined to use a surrogate value for the input because the agency has "a practice of not valuing subject merchandise using [surrogate values] and

---

[7] Carbon Activated Group supports the Government's opposition to Calgon's arguments.  Carbon Activated Group's Resp. at 14; *see id*. at 16–20 (supporting the Government's arguments regarding interpretation of *Nan Ya*, the likelihood that Carbon Activated knew it would be selected as a respondent, and against using an intermediate input methodology).  The court does not address Carbon Activated Group's arguments opposing the use of AFA because Carbon Activated Group did not challenge Commerce's determination with regard to that issue.

[has] departed from that practice only when the upstream FOPs have been found to be

inadequate." *Id*.  Commerce chose the third option because it mitigated the potential for

manipulation, was "based on adequately reported FOPs," and was "sufficiently adverse

to ensure cooperation." *Id*.  Thus, Commerce reasonably exercised its discretion and

explained its reasoning: the agency had three options, it assessed each option, and

explained why it selected the third option.

      The court is not persuaded by Calgon's arguments that the AFA data selected is

not sufficiently adverse.  Commerce reasonably addressed this argument following the

*Preliminary Results* by changing its AFA methodology to use the highest normal value

for any respondent.  *See id*.  The possibility that Commerce could have exercised its

discretion to select a higher value as AFA is an insufficient basis for finding that

Commerce's exercise of discretion in this case was inconsistent with the law.  The

agency is not required to select data that yields the highest possible margin when

choosing AFA.  *See Nan Ya*, 810 F.3d at 1347.  As the U.S. Court of Appeals for the

Federal Circuit ("the Federal Circuit") said in *Nan Ya*, "Congress decided what

requirements Commerce must fulfill in reaching its determination, § 1677e(b), and we

do not impose conditions not present in or suggested by the statute's text." *Id*.  The

mere fact that Calgon can imagine methodologies or data that would yield a higher

margin for Carbon Activated does not mean that Commerce failed to select an AFA

value that is insufficient to deter uncooperative behavior in the future.  Calgon's policy-

based arguments are best made to Commerce and do not provide a basis for the court

to disturb Commerce's determination.

Thus, Commerce's selection of AFA is consistent with law and must be sustained.

## II.   Surrogate Values

### A.  Legal Framework

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production[8] in a surrogate country, *see id*. § 1677b(c)(1), and those values are referred to as "surrogate values." In selecting its surrogate values, Commerce generally prefers publicly-available, "non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country."  19 C.F.R. § 351.408(c)(1), (4).

The phrase "best available information" is not defined in the statute, consequently, Commerce has broad discretion to determine what value(s) satisfy that requirement.  *See, e.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  In making its selection, Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy country, but instead must identify the surrogate value that "most accurately represents the fair market value" of

---

[8] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

the relevant factor of production.  *Nation Ford Chem. Co. v. United States*, 166 F.3d

1373, 1377 (citation omitted).

### B.  Coal Tar

#### 1.  Background

Commerce selected Mexican import data under HTS 2706.00 to value "coal tar"

and Thai[9] import data under HTS subheading 2708.10 to value "pitch."[10]  Surrogate

Values for the Final Results (Oct. 16, 2018) ("Final SV Mem.") at 2, Attach. 1, Master

SV, PR 248–49, CJA (Vol. III) Tab 35.[11]  The parties raise two interwoven issues with

respect to Commerce's valuation of coal tar.

The first issue is whether Commerce accurately determined that coal tar is a

distinct input from pitch.  Respondents' filings with Commerce use inconsistent

terminology to describe coal tar—interchangeably referred to as "coal tar pitch"—as

distinct from pitch.  I&D Memo at 10.  Respondents reported consuming coal tar with

roughly [[    ]] and [[    ]] percent pitch content.  *See* DJAC Resp. to Suppl. Sec. D

Questionnaire (Jan. 5, 2018) ("DJAC's SQDR"), Ex. SD-43, CR 135–51, PR 171–72,

CJA (Vol. III) Tab 22; Suppl. Sec. D Questionnaire Resp. (Jan. 9, 2018) ("Carbon

---

[9] Commerce selected Thailand as the primary surrogate country.  *See* I&D Mem. at 1
(explaining that Commerce followed its determination in the *Preliminary Results*,
excepting changes that Commerce made to "the margin calculations for the final
results"); Prelim. Decision Mem. at 15 (selecting Thailand as the primary surrogate
country).

[10] In the *Preliminary Results*, Commerce referred to the input "pitch" as "coal tar pitch."
Surrogate Values for Preliminary Results (May 3, 2018) ("Prelim. SV Mem.") at 1, PR
215–218, PJA (Vol. III) Tab 28.

[11] Due to its size, Attachment 1 to Commerce's Final SV Memorandum was filed
manually with the court.  *See* Notice of Manual Filing (Jan. 28, 2020), ECF No. 64.

Activated's SDQR"), Ex. SD-18, CR 152–62, PR 173–74, CJA (Vol. III) Tab 23.

Respondents explained in their case brief that coal tar with between [[          ]]

percent pitch content is "crude coal tar," not pitch.  Respondents' Case Br. at 21.

Calgon, however, asserted that "coal tar pitch" and pitch should be valued as the same

input because they are used for the same purpose in Respondents' production process.

Pet'rs' Rebuttal Br. (July 5, 2018) at 5, CR 202–03, PR 234, CJA (Vol. III) Tab 33.

Commerce cited Respondents' financial reporting and production process as

evidence that coal tar and pitch are two separate inputs.  I&D Mem. at 10 & n.68

(citations omitted).  "Whether [the inputs] were used for the same purpose in the

production process is inapposite to what the inputs actually were."  *Id*. at 10.

Commerce did not value a third input (i.e., coal tar pitch).  *See id.*; Final SV Mem.,

Attach. 1, Master SV.

The second issue is whether Mexican import data are the best information

available to value coal tar.  Commerce determined that the Mexican import data under

HTS heading 2706.00 constituted the best available information because: (1) Mexico is

at the same level of economic development as China; and (2) Mexico had the largest

volume of reliable data as compared to other potential surrogate countries.  I&D Mem.

at 11.  While Commerce normally seeks to value all factors of production from a single

surrogate country, 19 C.F.R. § 351.408(c)(2), Commerce explained that all Thai imports

under HTS heading 2706.00 were imported under a basket-category subheading and,

thus, were not specific to the input.  *Id*. at 10–11.

> ## 2.  Parties' Contentions

Calgon contends that Commerce's valuation of coal tar is not supported by substantial evidence for two reasons.  First, Calgon argues that Commerce's distinction between coal tar and pitch is not based on substantial evidence given Respondents' inconsistent terminology and record evidence that coal tar and pitch are used for the same purpose in Respondents' production process.  Calgon's Mem. at 12–17.  Second, for valuation purposes, assuming that coal tar and pitch are distinct inputs, Commerce failed to consider whether the Mexican data exhibited the same flaw as the Thai data. *Id.* at 17–21.

Carbon Activated Group acknowledges that Mexican import data under HTS 2706.00 are the "best among the set of GTA HTS 2706.00 import data" to value coal tar but argues that Commerce should have applied Carbon Activated Group's proposed methodology to cap the Mexican data.  Carbon Activated Group's Mem. at 20.  Carbon Activated Group's methodology would limit the surrogate value of coal tar by both the price of 100 percent pitch and the price of metallurgical coke.  *Id.* at 21–22.

The Government contends that Commerce sufficiently explained its determination that coal tar and pitch are different inputs even if the agency did not fully address all of Calgon's arguments.  Gov't Resp. at 22–23.  The Government also contends that the Mexican data do not exhibit the same flaws as the Thai data.  *Id.* at 23.  The Government further contends that Carbon Activated Group's proposed methodology uses the average of pitch values from countries that are not at the same level of economic development as China and there is no evidence those countries' data

otherwise meets Commerce's requirements for consideration as surrogate values.  *Id.*

at 25.  In any event, the Government contends, Commerce was not obligated to

demonstrate that its methodology was the only reasonable methodology.  *Id.* at 24–25.

### 3.  Substantial Evidence Supports Commerce's Valuation of Coal Tar

First, substantial evidence supports the agency's conclusion that coal tar and

pitch are distinct inputs notwithstanding Respondents' inconsistent use of terminology.

I&D Mem. at 10.  Commerce identified substantial evidence upon which to support its

conclusion that Respondents consumed coal tar (e.g., coal tar pitch) and pitch as

separate inputs, *id.* at 10 & n.68 (citing Carbon Activated Resp. to Sec. D of

Questionnaire (Sept. 15, 2017) ("Carbon Activated's DQR"), Attach. C, Ex. D-5, CR 60–

104, PR 111–15, CJA (Vol. I) Tab 19; Carbon Activated's SDQR at 11).

The court discerns from Commerce's discussion that the separate inputs of coal

tar and pitch reflect what the "inputs actually were," I&D Mem. at 10, based on pitch

content of the input material and not simply the label Respondents attached to the input,

Respondents' Case Br. at 21.[12]  Calgon's argument that Respondents used the inputs

"coal tar pitch" and pitch for the same purpose in their production process, Calgon's

Mem. at 16, is unavailing.  As Commerce explained, that "coal tar and pitch were used

for the same purpose in the production process" does not necessarily mean that the

inputs were identical.  I&D Mem. at 10.

---

[12] Calgon acknowledges that coal tar contains some pitch.  Calgon's Mem. at 14 ("Coal tar extracted from coking coal, and refined coal tar *with a specific pitch content*, must be further distilled and refined into a 'pitch' . . . .") (emphasis added).

Second, Commerce's selection of Mexican import data to value coal tar is also supported by substantial evidence.  Commerce normally values all FOPs from a single surrogate country.  19 C.F.R. § 351.408(c)(2).  Here, Commerce explained that the Thai imports were not the best information available to value coal tar because the Thai data were imported under a basket subheading including "other" coal tar rather than the two subheadings that "more accurately describe the input in question."  I&D Mem. at 10–11. Commerce then found that Mexican data were the best available information to value coal tar.  *Id.* at 11.  While Calgon is correct that Commerce did not examine the Mexican subheadings relevant to its valuation of coal tar in the same way it examined the Thai subheadings, Calgon's Mem. at 20, the Mexican data placed on the record did not include a comparable breakdown of imports by subheading.  *See* DJAC and CAC Final SV Submission (Apr. 2, 2018), Ex. 4, PR 192–193, CJA (Vol. III) Tab 24.  Thus, Calgon has failed to establish that the Mexican data exhibits the same problems.  It is the responsibility of interested parties—not Commerce—to build the factual record supporting its position.  *QVD Food*, 658 F.3d at 1324.

Finally, Commerce was not obligated to adopt Carbon Activated Group's proposed methodology to cap the value of coal tar.  *See* Carbon Activated Group's Mem. at 18–22.  Carbon Activated Group's methodology is premised on accepting what it asserts is an "axiomatic" pricing relationship between the values of coal tar, pitch, and metallurgical coke.  *See id.* at 20 ("[I]t is axiomatic that the unit value of [Carbon Activated Group]'s input . . . cannot exceed the value of the principal product – metallurgical coke – of which it is a mere by-product.").  Even if Commerce were to

accept that the production process suggests a relationship between the costs of

producing each of these materials, nothing requires Commerce to limit or otherwise

ignore observed prices for the input in question in a surrogate market economy country.

In short, while Carbon Activated Group may have identified an alternative method for

valuing coal tar, it ignores the fact that its cap is based on prices in countries not at the

same level of economic development and, more importantly, the existence of an

alternative value is insufficient to establish that the value selected by Commerce is

unreasonable.  *See JMC Steel Grp. v. United States*, 38 CIT ___, ___, 24 F. Supp. 3d

1290, 1313 (2014).  For these reasons, the court sustains Commerce's valuation of coal

tar.

### C.  Hydrochloric Acid

#### 1.  Background

Respondents reported consuming hydrochloric acid ("HCl") of [[      ]] and [[      ]]

percent concentration.  Carbon Activated SDQR, Ex. SD-18; DJAC's SDQR, Ex. SD-56.

Commerce selected Thai GTA import data under HTS subheading 2806.10.00102 with

a concentration of 15 to 33 percent (referred to as "the eleven-digit data") to value HCl.

I&D Mem. at 19–20.  Commerce explained that the eleven-digit data were superior to

the other data in the record because those other data did "not indicate a concentration

range."  *Id.* at 20.

Respondents urged Commerce to consider data from the Independent Chemical Information Services ("ICIS"),[13] which indicates a concentration range of 33 to 35 percent, as a benchmark for comparing the Thai data.  Respondents' Case Br. at 49–55; First Surrogate Value Cmts. by DJAC and [Carbon Activated] (Sept. 15, 2017) ("Respondents' First SV Cmts."), Ex. 3, PR 116–21, CJA (Vol. II) Tab 20.  Commerce declined to do so because the ICIS data "are not from economically comparable countries."  I&D Mem. at 21.

Commerce used the less-specific (i.e., not indicating a concentration range) GTA import data under HTS 2806.10 (referred to as "the six-digit data") from economically comparable countries as benchmarks.  *See id.* at 20–21; Prelim. Decision Mem. at 13 (identifying economically comparable countries).  Comparisons to these benchmarks showed that the average unit value ("AUV") of the eleven-digit data was "not the highest reported figure"; it was lower than the Thai and South African six-digit AUVs.  I&D Mem. at 20.  Commerce relied on this comparison to conclude that the eleven-digit data are not distortive despite representing a small import quantity.  *Id.* at 21.

Commerce also compared the eleven-digit data to historical values.  *Id.* at 20. The agency found that the eleven-digit data have a lower AUV than "the Thai import values under the eleven-digit subheading used" in each of the three preceding

---

[13] ICIS is a publisher of price data for chemicals and provides European and U.S. HCl prices.  I&D Mem. at 17.

reviews.[14]  *Id.*  However, after Commerce published the *Amended Final Results*, the agency changed its surrogate value for HCl in AR7 and AR8 pursuant to court remands, resulting in substantially lower AUVs for HCl in those reviews.[15]  *See* Carbon Activated Group's Reply at 11–12.

### 2.  Parties' Contentions

Carbon Activated Group advances three arguments: (1) Commerce improperly rejected the ICIS data as benchmarks, Carbon Activated Group's Mem. at 25–26; (2) Commerce should have addressed data from Bulgaria and Romania when evaluating import quantity and AUV of the eleven-digit data, *id.* at 26–27;[16]  and (3) Commerce's comparison to historical data is invalid in light of changes made upon remand in AR7 and AR8, Carbon Activated Group's Reply at 10–12.[17]

---

[14] The three previous administrative reviews are referred to as "AR7," "AR8," and "AR9," respectively.

[15] Pursuant to the court's instructions on remand in AR7 and AR8, Commerce selected a primary surrogate country other than Thailand and did not use Thai data to value HCl. *See Jacobi Carbons AB v. United States*, 43 CIT ___, ___, 422 F. Supp. 3d 1318, 1321 (2019) (selecting Malaysia as the primary surrogate country in AR8 and using Malaysian data to value all FOPs except carbonized material and financial ratios); *Jacobi Carbons AB v. United States*, 43 CIT ___, ___, 422 F. Supp. 3d 1308, 1311 (2019) (using "Indonesian data for all surrogate values with the exception of the surrogate financial ratios" in AR7).

[16] Carbon Activated Group styles this argument as two separate arguments.  Carbon Activated Group's Mem. at 26–29 (second and fourth arguments).  The court will address these arguments together because both assert that Commerce failed to consider the Bulgarian and Romanian data in comparing the AUVs of the six-digit Thai and South African data to the eleven-digit Thai data.  *Id.*

[17] Carbon Activated Group also contends that Commerce should have relied on the ICIS data to value HCl.  Carbon Activated Group's Mem. at 29–30.

The Government contends that substantial evidence supports Commerce's determination that the eleven-digit data are specific to the input and the agency adequately explained its rejection of the ICIS data. Gov't's Resp. at 26–27.[18] The Government contends that Commerce considered other AUVs such that its determination that the eleven-digit data are not aberrational is supported by substantial evidence. *Id.* at 29–30. The Government supports Commerce's comparison to historical data but did not have the opportunity to explain how the newly-selected data in AR7 and AR8 affect that comparison. *See id.* at 29.[19] Finally, the Government avers that Commerce sufficiently considered the Bulgarian and Romanian data in finding the eleven-digit data reliable. *Id.* at 29–30.

### 3. Commerce's Valuation of Hydrochloric Acid is Supported by Substantial Evidence

Carbon Activated Group contends that Commerce erred in rejecting ICIS data for benchmarking purposes. *See* Carbon Activated Group's Mem. at 25. This argument is not persuasive.

Although the ICIS data indicate a concentration range, their relevance is limited because they derive from economically non-comparable countries. *See* I&D Mem. at

---

[18] Calgon agrees with and incorporates the Government's arguments with respect to the HCl surrogate value. Calgon's Resp. at 6.

[19] Carbon Activated Group did not raise Commerce's revised surrogate values in AR7 and AR8 as an issue until its reply. Carbon Activated Group's Reply at 10–12. Thus, this argument would typically be subject to waiver. *See Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005). Nevertheless, the court will address Carbon Activated Group's argument regarding the HCl data used in previous reviews because Commerce only made those remand determinations in AR7 and AR8 after Carbon Activated Group filed its initial memorandum. *See supra*, note 15.

21; *Jacobi Carbons AB v. United States* ("*Jacobi (AR7) II*"), 42 CIT ___, ___, 313 F.

Supp. 3d 1308, 1337 (2018) ("[E]conomic comparability and, thus, the usefulness of

proffered benchmarks, is a matter of degree.").  Commerce supported its surrogate

value selection by comparing it to several benchmarks from economically comparable

countries and finding that the eleven-digit data's AUV was not the highest reported

figure.  *See* I&D Mem. at 20.  In other words, Commerce assigned significant weight to

benchmarks from economically comparable countries and no weight to the ICIS data.

The court will not second guess Commerce's assignment of weight to these

benchmarks.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369,

1376–77 (Fed. Cir. 2015) (explaining that the court does not reweigh the evidence).[20]

Carbon Activated Group is correct that Commerce changed its surrogate values

for HCl in the redeterminations upon remand in AR7 and AR8.  Carbon Activated

Group's Reply at 11.  As Carbon Activated Group contends, these changes significantly

lower the combined average value of HCl in the past three reviews.  *Id.* at 12.  But

Commerce did not compare the Thai eleven-digit data for HCl in this review to the

combined average value of HCl in the past three reviews.  Rather, the agency

---

[20] Carbon Activated Group avers that Commerce may not reject benchmarks solely
because they derive from economically non-comparable countries.  Carbon Activated
Group's Mem. at 25–26 (citing *Jacobi (AR7) II*, 313 F. Supp. 3d at 1336–37). This
argument is not persuasive.  In *Jacobi (AR7) II*, the court was unable to discern
Commerce's rationale for excluding certain historical benchmarks from countries that
were currently non-comparable but might have been comparable in the past.  313 F.
Supp. 3d at 1337–38.  The court is able to discern Commerce's reasons for rejecting
the ICIS data and it is not analogous to the fact pattern in *Jacobi (AR7) II*.

compared the AUV of the eleven-digit data to the individual AUVs for HCl in each of the

previous reviews and concluded that the eleven-digit data were not aberrational

because its AUV is lower than the individual AUVs in the previous reviews.  *Id.* at 20.

To that end, the AUV for HCl in AR9, which is higher than the AUV at issue in this

review,[21] has not been modified.  *See* Carbon Activated Group's Reply at 11.  Thus, the

AR9 data continues to support Commerce's conclusion that the eleven-digit data in this

review is not aberrantly high in light of historical data.[22]

Commerce found that the eleven-digit data in this review is within an acceptable

range of values when compared to the six-digit Thai and South African data for this

POR.  I&D Mem. at 20.  Commerce used the same comparison to determine that the

eleven-digit data's small import quantity did not render it unreliable.  *Id.* at 21.  Carbon

Activated Group asserts that Commerce should have included the Bulgarian and

Romanian data (representing larger import quantities and smaller AUVs) in these

comparisons.  Carbon Activated Group's Mem. at 26–29.  However, Commerce

considered the AUVs of the Romanian and Bulgarian data and was not persuaded that

they impeached the eleven-digit data because the data were derived from a broader

HTS category.  I&D Mem. at 20–21.  The fact that a party can point to evidence that

detracts from the agency's conclusion or that there is a possibility of drawing two

---

[21] The Thai data in AR9 has an AUV of $1,723.21 per metric ton, and the eleven-digit data in this review has an AUV of $1,717 per metric ton.  *See* Carbon Activated Group's Reply at 11.

[22] The court rejects the argument that Commerce would have reconsidered the HCl value in AR9 given the opportunity, Carbon Activated Group's Reply at 12, because it is speculative and without support.

inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Thus, Carbon Activated Group's argument fails.

For these reasons, the court sustains Commerce's valuation of HCl. Because substantial evidence supports Commerce's selection of data, the court does not reach Carbon Activated Group's argument that the agency should have relied on other data to value HCl. *See* Carbon Activated Group's Mem. at 29–30.

### D. Carbonized Material

#### 1. Background

Commerce valued carbonized material using Thai import data under HTS subheading 4402.90.10000. I&D Mem. at 14. At issue are imports from France and Japan that are included in the Thai data. *See* Prelim. SV Mem. at 3, Attach. 1, Circulated_SV_Data.[23] The French imports include wood-based charcoal; a material dissimilar from and with a substantially higher AUV than the AUV of the other imports under subheading 4402.90.10000.[24] *See* Respondents' First SV Cmts., Ex. 4A (discussing "quantities of wood charcoal . . . exported from France to Thailand" in email correspondence, and attaching information regarding the quantities imported from

---

[23] Due to its size, Attachment 1 to Commerce's Preliminary SV Memorandum was filed manually with the court. *See* Notice of Manual Filing (Jan. 28, 2020), ECF No. 64.

[24] French imports comprise 141,130 Kg (or 52 percent) of the total Thai GTA import data (270,570 Kg). Prelim. SV Mem., Attach. 1, Circulated_SV_Data. The French imports' AUV is 44.64 Baht per kilogram ("Baht/Kg") (i.e., 6,300,491 Baht divided by 141,130 Kg). *Id.* This is more than twice the AUV for the other imports—including the Japanese imports—18.68 Baht/Kg (i.e., 2,418,033 Baht divided by 129,440 Kg). *Id.*

France).  The Japanese imports represent a small import quantity with a substantially higher AUV.  *See* Prelim. SV Mem., Attach. 1, Circulated_SV_Data.

Commerce rejected Respondents' argument that Commerce should exclude the French and Japanese imports from the Thai data.  I&D Mem. at 15–16; *see also* Respondents' Case Br. at 39–45.  With respect to the French imports, Commerce found that the "record lacks information that demonstrates that French imports under HTS 4402.90.1000 were indeed wood-based charcoal."  I&D Mem. at 15.  Commerce stated that, contrary to Respondents' claim that "all French imports were comprised of wood-based charcoal powder," the evidence Respondents placed on the record only "cover[ed] *part* of the POR.*"  Id.* (emphasis added).  Commerce thus found that "the record lacks sufficient basis . . . to conclude that Thai GTA import data for the *entire* POR [are] aberrational."  *Id*. (emphasis added).

Commerce did not exclude the Japanese imports because "merely appearing on the low or high end of the range of values is not enough to find such data aberrational." *Id.* at 16.

### 2.  Parties' Contentions

Carbon Activated Group contends that substantial evidence undermines Commerce's inclusion of the Japanese and French imports.  Carbon Activated Group's Mem. at 31–38.[25]  Carbon Activated Group avers that Commerce's inclusion of the

---

[25] Carbon Activated Group asserts that remand is required because "substantial evidence directly contradicts Commerce's underlying findings" for valuing carbonized material.  Carbon Activated Group's Mem. at 31.  This assertion mischaracterizes the standard of review, which requires that Commerce support its determination with

French data is based on inconsistent reasoning and contrasts with Commerce's

decision to exclude French imports from Thai import data in AR8 and AR9.  *Id.* at 31–

34.  Carbon Activated Group asserts that the Japanese data's quantity and AUV

undermine Commerce's conclusion that the data are not aberrational.  *Id.* at 37.

Accordingly, Carbon Activated Group contends that Commerce should have relied on

Philippine data to value carbonized material.  *Id.* at 37–38.

The Government contends that Commerce's finding that "Thai import data from

France . . . cover a part of the [POR]" is supported by substantial evidence.  Gov't's

Resp. at 32 (quoting I&D Mem. at 15) (emphasis omitted).  The Government avers that

Commerce's reasoning for not finding the Japanese data aberrational—"merely

appearing on the low or high end of a range of values is not enough to find such data

aberrational"—has been affirmed by the court in other cases.  *Id.* at 33 (quoting I&D

Mem. at 16).  The Government, however, does not respond to Carbon Activated

Group's argument that Commerce's reasoning for including the French imports is

inconsistent.

### 3.   Commerce's Inclusion of French and Japanese Imports in the Thai Data Must be Remanded for Further Explanation or Reconsideration

Commerce has not sufficiently explained its reasoning for including the French

and Japanese import data in the Thai surrogate value.

---

substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's determination is not
unsupported by substantial evidence even when evidence on the record supports a
different conclusion.  As the Supreme Court of the United States explained in *Consolo
v. Federal Maritime Commission*, "the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative agency's finding from
being supported by substantial evidence."  383 U.S. 607, 619–20 (1966).

Commerce's apparent recognition that the Thai data contain French imports (wood-based charcoal) for part of the POR contradicts its finding that the "record lacks information that demonstrates that French imports under HTS 4402.90.1000 were indeed wood-based charcoal."  I&D Mem. at 15.  Because of this contradiction, the court cannot adequately discern the agency's reasoning for selecting the surrogate value for carbonized material.  *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[T]he path of Commerce's decision must be reasonably discernable to a reviewing court.").

Commerce failed to explain why the fact that the French imports do not cover the entire POR is a basis for not excluding them as otherwise aberrational or distortive.  The imports from France comprise 52 percent of the Thai GTA import quantity and have an AUV twice that of the remaining Thai import data.  *See supra*, note 24.  Commerce failed to address this evidence.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that an agency determination is "arbitrary and capricious" if the agency "failed to consider an important aspect of the problem").[26]

---

[26] Additionally, in AR8 and AR9, Commerce excluded French imports from the Thai GTA import data under HTS 4402.90.10000 because it agreed that the French data were not specific to the input in question.  *See Certain Activated Carbon From the People's Republic of China*, 81 Fed. Reg. 62,088 (Dep't Commerce Sept. 8, 2016) (final results of antidumping admin. review; 2014–2015) and accompanying Issues and Decision Mem., A-570-904 (Aug. 31, 2016) at 32–33, *available at* https://enforcement. trade.gov/frn/summary/prc/2016-21660-1.pdf (last visited May 13, 2020); *Certain Activated Carbon From the People's Republic of China*, 81 Fed. Reg. 51,607 (Dep't Commerce Nov. 7, 2017) (final results of antidumping duty admin. review; 2015–2016)

Commerce also failed to sufficiently explain its refusal to exclude the Japanese

imports.  Evidence shows that the Japanese data are based on a small quantity (16 Kg)

and have an AUV of 910.94 Baht/Kg, Prelim. SV Mem., Attach. 1, Circulated_SV_Data,

which is almost 30 times higher than the AUV of the Thai import data (32.22 Baht/Kg),

Final SV Mem., Attach. 1, Master SV.  Commerce's refrain that "appearing on the low or

high end of a range of values is not enough to find such data aberrational," I&D Mem. at

15, does not address the "enormous disparity between the values shown" in the Thai

data compared to the Japanese data, *Jacobi Carbons AB v. United States*, 42 CIT ___,

___, 313 F. Supp. 3d 1344, 1365 (2018) (quoting *Peer Bearing Co.-Changshan v.*

*United States*, 35 CIT ___, ___, 752 F. Supp. 2d 1353, 1371 (2011)).

On remand, Commerce must reconsider or clarify its surrogate value selection

for carbonized material consistent with this Opinion and the court need not reach

Carbon Activated Group's argument that Commerce must rely on the Philippine data.

---

and accompanying Issues and Decision Mem., A-570-904 (Nov. 1, 2017) at 25,
*available at* https://enforcement.trade.gov/frn/summary/prc/2017-24184-1.pdf (last
visited May 13, 2020).  Respondents argued in their fillings to Commerce that the
agency's reasoning for excluding the French import data in AR8 and AR9 demonstrated
that the Thai import data are distorted in this review.  Respondents' Case Br. at 43–45.
Commerce ignored this argument.  *See* I&D Mem. at 14–16.  On remand, if the agency
continues to rely on the Thai import data inclusive of the French imports, then
Commerce must reconcile its findings based on the relevant review records.

### E. Financial Statements

#### 1. Background

For the *Final Results*, Commerce valued financial ratios using the 2016 financial statement from the Romanian[27] company, Romcarbon SA ("Romcarbon").  I&D Mem. at 27–28.  This determination represented a change from the *Preliminary Results*, for which Commerce relied on the 2011 financial statement of Carbokarn Co., Ltd. ("Carbokarn"), a Thai producer of activated carbon.  Prelim. Decision Mem. at 27.

Commerce acknowledged its preference to value all factors or production in a single surrogate country (in this case, Thailand) but reasoned that Carbokarn's financial statement was not the best information available because it contained "tax coupon receivables," which refers to a program the agency found to provide a countervailable subsidy in a separate countervailing duty investigation.  I&D Mem. at 27 & n.193 (citing *Certain Frozen Warmwater Shrimp From Thailand*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) (final negative countervailing duty determination) ("*Thai Shrimp*") and accompanying Issues and Decision Mem., C-549-828 (Aug. 12, 2013) ("Shrimp I&D Mem.") at 36–38, *available at* https://enforcement.trade.gov/frn/summary/thailand/2013-20166-1.pdf (last visited May 13, 2020)).  Commerce also noted that Carbokarn's 2011 financial statement was not contemporaneous with the POR.  *Id.* at 27.

---

[27] Romania was included on Commerce's list of economically comparable countries with significant production of comparable merchandise.  Prelim. Decision Mem. at 13–14.

The agency found that Romcarbon's financial statement was superior to Carbokarn's even though Romcarbon primarily produces non-comparable products and materials and only some activated carbon.  *Id.*[28]  Commerce reasoned that Romcarbon's 2016 financial statement was from a country at a comparable level of economic development to China and contemporaneous with the POR.  *Id*.

For the *Final Results*, Commerce made several adjustments to information presented in Romcarbon's financial statement to calculate the financial ratios.  These adjustments are identified in a spreadsheet attached to the final surrogate value memorandum and discussed in that memorandum.  *See* Final SV Mem. at 2–3, Attach. 1, Romcarbon.

### 2.  Parties' Contentions

#### a.  Commerce's Selection of Romcarbon's Financial Statement

Calgon argues that Commerce was obligated to perform a "side-by-side" analysis of the Carbokarn and Romcarbon financial statements, and its failure to do so prevents its determination from being supported by substantial evidence.  Calgon's Mem. 33–37 (citing, *inter alia*, *CP Kelco US, Inc. v. United States*, Slip Op. 15-27, 2015 WL 1544714 (CIT Mar. 31, 2015)).  Calgon further contends Romcarbon's financial statement is not the best information available because Romcarbon's operations focus mainly on products that are not comparable to the subject merchandise.  *Id.* at 39.  Calgon argues

---

[28] Commerce also explained why it rejected 2016 financial statements from Kekwa Indah Sdn. Bhd. and Century Chemical Works Sendirian Berhad, both of Malaysia.  I&D Mem. at 27.  No party argues that Commerce erred in rejecting these financial statements.

that Commerce provided no analysis or discussion of the "tax coupon receivables" subsidies found to be countervailable in the *Thai Shrimp* case or how they relate to a producer of activated carbon.  *Id.* at 41; Calgon's Reply at 16.

The Government asserts that Commerce adequately considered the strengths and weaknesses of the financial statements at issue and its decisional path is clear.[29] Gov't Resp. at 35–38 (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).  The Government argues that Commerce has discretion in selecting surrogate financial statements and Congress has directed Commerce to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized."  *Id.* at 39 (quoting I&D Mem. at 26); *see also* Carbon Activated Group's Resp. at 13–14 (citing 19 U.S.C. § 1677b(c)(5)).

### b.  <u>Commerce's Adjustments to the Financial Statement</u>

Carbon Activated Group argues that certain adjustments made by Commerce to the data in Romcarbon's financial statement are not supported by substantial evidence and Commerce failed to provide an explanation for the adjustments.  Carbon Activated Group's Mem. at 8–16.

The Government argues that Carbon Activated Group failed to exhaust its administrative remedies with regard to its adjustment arguments.  Gov't Resp. at 39. While Carbon Activated Group was aware that Romcarbon's financial statements were under consideration, the Government argues, Carbon Activated Group failed to raise

---

[29] Carbon Activated Group agrees with the Government that Commerce adequately analyzed the two financial statements.  Carbon Activated Group's Resp. at 8.

any arguments regarding adjustments to those financial statements and no exception to

the exhaustion requirement applies.  *Id.* at 41–42.

> **3.  Substantial Evidence Supports Commerce's Selection of Surrogate Financial Statements, But the Agency's Adjustments to the Financial Statements Must be Remanded for Further Explanation**

> > **a.  <u>Commerce's Selection of Romcarbon's Financial Statement to Determine Surrogate Financial Ratios is Supported by Substantial Evidence</u>**

Substantial evidence supports Commerce's assessment of the respective

strengths and weaknesses of the available financial statements and its conclusion that

Romcarbon's financial statement was the best available information.  I&D Mem. at 27–

28.

First, Commerce explained its concerns with the Carbokarn financial statement.

*Id.* at 27.  Commerce explained that the "Carbokarn[] 2011 financial statement is not

contemporaneous with the POR, as it covered calendar year 2011."  *Id.*  Moreover, the

Carbokarn financial statement lists "Tax coupon receivables," which Commerce found,

in *Thai Shrimp*, was a countervailable subsidy.  I&D Mem. at 27 & n.193 (citing, *inter

alia*, Shrimp I&D Mem. at 36–38); *see also* Pet'rs' Submission of Surrogate Values

(Sept. 15, 2017), Attach. 4 (ECF No. 54-2 at p. 1219), PR 122–25, CJA (Vol. II) Tab 21

(listing "Tax coupon receivables" under "Trade and other receivables").  Commerce

properly exercised its discretion to "disregard price or cost values without further

investigation," having determined "that broadly available export subsidies existed or

particular instances of subsidization occurred with respect to those price or cost values."

19 U.S.C. § 1677b(c)(5).  Thus, Commerce's determination that the Carbokarn financial

statement contains evidence of the company's receipt of a countervailable subsidy is supported by substantial evidence.

Second, Commerce explained why the 2016 Romcarbon financial statement was an appropriate source for valuing financial ratios.  Commerce acknowledged that the Romcarbon financial statement is from a producer whose "principal manufacturing activities are polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters, and protective materials," but found that "Romcarbon produces some activated carbon."  I&D Mem. at 27.  Commerce also found that Romania is at the same level of economic development as China and that the financial statement is audited, complete, publicly available, contemporaneous with the POR, and does not indicate receipt of any countervailable subsidies.  *Id.*

Commerce's assessment of the financial statements show that it sufficiently considered and explained its reasons for selecting Romcarbon's as the "best available information."  *Id.* at 28.  Calgon argues that "Romcarbon is not a significant producer of merchandise identical to or comparable to activated carbon."  Calgon's Mem. at 40.  But Calgon fails to identify a standard for determining the reliability of financial statements based on the level of production of the same or comparable merchandise.  Moreover, Commerce recognized that Romcarbon's principal manufacturing activities related to other types of materials, but that it produced some activated carbon.  I&D Mem. at 27. The court will not reweigh the evidence considered by Commerce.

Calgon's reliance on the court's opinion in *CP Kelco US* is unavailing.  As discussed above, this is not a situation in which Commerce "effectively ignored the

weakness" of one financial statement.  2015 WL 1544714, at *6.  Contrary to Calgon's

argument, and the holding in *CP Kelco*, this is also not a situation in which Commerce

was required to conduct a side-by-side evaluation of the 2011 Carbokarn financial

statement to the 2016 Romcarbon financial statement.  *CP Kelco* reviewed a 2013 final

determination by Commerce, 2015 WL 1544714, at *1, one made prior to the effective

date of the 2015 amendment to the Tariff Act of 1930 adding 19 U.S.C. § 1677b(c)(5),

which expressly allows Commerce to "disregard price or cost values without further

investigation if [it] has determined that . . . particular instances of subsidization occurred

with respect to those price or cost values."  *See TPEA Effective Date*, 80 Fed. Reg. at

46,795 (applying 19 U.S.C. § 1677b(c)(5) "to determinations made on or after August 6,

2015").  Thus, the statute expressly authorizes Commerce to disregard a financial

statement found to include countervailable subsidies such as Carbokarn's without

further investigation and *CP Kelco* is inapposite to this case.[30]

---

[30] Calgon also argues that Commerce has found Carbokarn's financial statements
superior to Romcarbon's in AR8 and AR9.  Calgon's Mem. at 38.  However, in AR8,
pursuant to court remand, Commerce declined to use Carbokarn's financial statement
and selected Romcarbon's financial statement to value financial ratios.  *See Jacobi
Carbons AB v. United States*, 43 CIT ___, ___, 365 F. Supp. 3d 1344, 1348 (2019).
Commerce's AR9 Final Results were not subject to judicial challenge.  In any event, it is
well settled that each administrative review is a separate exercise of Commerce's
authority and allows for different conclusions based on different facts in the record.
*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2014).
Thus, Commerce's previous valuations of financial ratios did not require the agency to
select the Carbokarn financial statement in this review.

### b. Commerce's Adjustments to Romcarbon's Financial Statement Are Remanded for Further Explanation.

Congress has directed the U.S. Court of International Trade ("USCIT") to, "whe[n] appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d). While exhaustion is not jurisdictional, *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363–64 (Fed. Cir. 2019), the statute "indicates a congressional intent that, absent a strong contrary reason, the [USCIT] should insist that parties exhaust their remedies before the pertinent administrative agencies," *id.* at 1362 (quoting *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2010)).

Here, the Government's argument that Carbon Activated Group had an opportunity to raise its arguments regarding adjustments to Romcarbon's financial statements, Gov't's Resp. at 40–41, lacks merit.  While Respondents argued for using Romcarbon's financial statement to calculate surrogate financial ratios, Respondents' Case Br. at 74–77, no party argued that, if selected, Romcarbon's financial statements would require any adjustments and Carbon Activated Group's argument is not substantively distinct from that position.  Thus, this case is not analogous to the facts before the Federal Circuit in *Boomerang*, when that court found that parties "either knew or should have known" that that the selection of certain data were at issue and all arguments should have been raised at that time.  856 F.3d at 913.  *Boomerang* stands for the proposition that parties having notice of an issue may not withhold pertinent arguments at the administrative level, seeking a new "bite at the apple" before the courts.  *See id.*  *Boomerang* does not require parties to anticipate issues that have not been raised by a party or the agency at that point.  *Cf. Unicatch Industrial Co., Ltd. v.*

*United States*, Slip Op. 19-162, 2019 WL 6879197, at *5 (CIT Dec. 17, 2019) ("Unicatch had the opportunity to present this adjustment to Commerce; it must bear the consequences of its failure to do so.").

Because Respondents did not have an opportunity to address their objections to the adjustments to Romcarbon's financial statements before the agency and Commerce did not have the opportunity to consider those objections, the *Final Results* are remanded so that Commerce may consider Carbon Activated Group's arguments in the first instance.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results*, as amended by the *Amended Final Results*, are remanded; it is further

**ORDERED** that, on remand, Commerce shall, consistent with this Opinion, clarify or reconsider its selection of surrogate data to value carbonized material; it is further

**ORDERED** that, on remand, Commerce shall, consistent with this Opinion, clarify or reconsider the adjustments to the surrogate financial statement; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before August 11, 2020; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 4,000 words.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: May 13, 2020
          New York, New York